This case number 21-13779, Robert v. City of Boca Raton, Florida Good morning, Your Honors, and may it please the Court, my name is Richard Lobis and I represent Appellant Steve Robert. Mr. Robert is a black male, he was terminated from the City of Boca Raton Police Department after one minor memorandum of counseling detailing minor policy violations. Mr. Robert brought actions against the City of Boca Raton as well as three individual officers under Title VII, the Florida Civil Rights Act, and Section 1983. The District Court dismissed Mr. Robert's claims against the City and against all the individual officers on summary judgment as to the Title VII claims and the Florida Civil Rights Act claims, which are analyzed under the same standard. The District Court's decision was based on a purported failure by Mr. Robert to identify sufficient comparators to establish a prima facie case under the framework established by the Supreme Court in McDonnell-Douglas Court v. Green. We contend that the District Court also erred in failing to consider Mr. Robert's argument that he had also presented under a different framework a convincing mosaic of circumstantial evidence of discrimination. Mr. Robert raised that argument in summary judgment and the District Court wholly ignored the argument. It was not considered despite a finding that Mr. Robert had not established his claims under the McDonnell-Douglas framework. The trial court should have gone to the analysis under the convincing mosaic framework. Under the Section 1983 claims, the District Court determined that none of the individual defendants were properly characterized as policy makers such that their conduct could not constitute an official municipal policy, which is required when the two hold a municipality liable under Section 1983. The District Court also dismissed the Section 1983 claims against the individual officers because it determined that they had only been sued in their official capacities as opposed to their individual capacities as well. And even if those individuals had been sued in their individual capacities, they were not decision makers for the purposes of 1983, which would be required for individual liability under that statute. So moving to the Title VII claims, the McDonnell-Douglas prima facie framework oftentimes racial discrimination cases, like this, are decided based on circumstantial evidence. A plaintiff is permitted to establish a discriminatory intent using circumstantial evidence and one of the ways that that is done is under the framework established in the McDonnell-Douglas case. And we're here, the District Court's decision was based on a single one of those factors, and that is whether the plaintiff's employer treated similarly situated employees outside of that employee's protected class differently or more favorably. The test for similarly situated comparators is that they have to have engaged in the same basic conduct or misconduct as a plaintiff. Do you agree that that's the standard? Well, I think that all parties agree that the standard is detailed in this Court's decision in Lewis. Yes. And the standard itself is whether or not the comparator is substantially similar in all material respects. And when you're looking at the comparator's conduct, the Lewis Court did note that the standard should be determined on a case-by-case basis and will depend on individual circumstances of each case. Yeah, that quote I read you is from Lewis about engaged in the same basic conduct. So here, it seems to me that the record is full of examples of Mr. Robert filing paperwork late or having it be incomplete, and I don't see that the comparators had a history of that same basic conduct. With respect to the same basic conduct, Your Honor, that was one of the examples of potential circumstances that the Lewis Court elucidated. However, there is a footnote in the Lewis decision saying that that circumstance is not without limits and specifically considers a circumstance where the conduct that's under scrutiny may be different. And I think importantly here, the key determining factor is that the conduct of the comparators that we have identified was more severe than what Mr. Robert was terminated for. And we believe that a strict comparison of the severity of conduct requiring that the conduct be identical between a plaintiff and the proffered comparators, it would eliminate an entire class of these types of cases where a plaintiff engages in less severe conduct but is punished more severely than the comparator peers. Do you disagree that there are instances in the record, numerous instances in the record of filing paperwork late and incomplete? I disagree that those were the factors for which Mr. Robert was terminated. I think that the record is clear that none of the litany of items that are offered in both the court below's decision as well as in Appley's brief, none of those were considered in Mr. Robert's termination decision. What Mr. Robert did set forth evidence in the court below that the only basis for his termination that he was relayed in real time were the two incidents of non-paperwork years that were detailed in the Memorandum of Counseling that he received on May 31st, 2017. Our position is that after acquired evidence, which is what that litany of incidents are, are not permitted to be considered in the McDonnell-Douglas prima facie case framework. The two instances of the late paperwork were detailed in writing once, but there were numerous occasions of oral counseling. Why are we supposed, of the late filed paperwork or the errors in paperwork, why should we be disregarding that? Yes, Your Honor, I think that the reason that those should not be considered at this point is because when engaged in a comparator analysis, the court needs to be examining the conduct for which the comparator, the plaintiff, was terminated for and the conduct that the comparator engaged in. These after-the-fact compiled instances after a forensic review of Mr. Robert's email accounts in litigation, number one, Mr. Robert disagrees with the characterization of those incidents. He should have had the opportunity to present that to a jury. Those are factual issues. You said in your brief that the litany of violations in which Mr. Robert allegedly engaged was compiled after his termination, but in fact, the halogen entries in the record were all created between May 11th and May 26th, 2017, which was before he was terminated on the 31st. I don't disagree with that, Your Honor, but I do not hold the items that are in the lower court's order or the appellee's brief were part of that halogen system. I think importantly, the halogen system, it is our contention that it was created after the fact. It was part of Officer Cobbling papering the file and covering his true animus, which we contend is discrimination, and that it was racially motivated. The halogen system, there weren't any incidents. Incidents is documented in real time in the halogen system. When you look at the city's policy of progressive discipline, a memorandum of counseling is the lowest form, and only two instances of what was compiled after the fact in the halogen system were then transposed onto a memorandum of counseling. So by the city engaging in that course of conduct, it is making clear that only the two incidents detailed in the memorandum of counseling rose to the level of even being considered as part of the rising to the level of requiring any form of discipline. You seem to be focusing in your argument on what was actually relayed to Mr. Robert, but what difference does that make? Because we know that the people who made the decision actually had the information before he was given the opportunity to resign. So why does it matter whether they walk through every instance with him? I don't believe it's in the record that the individuals who made the decision actually were informed of all of the instances that are now being set forth as the basis for Mr. Robert's termination. Mr. Robert has presented evidence that he was relayed, first of all, the individual who made the decision, it's our contention that that's Officer Codling, and we believe that there's this very serious issue of fact as to what authority Mr. Codling or Officer Codling had on the day of Mr. Robert's termination. And so he was able to effectuate that termination, you know, the adverse employment action the day that Mr. Robert was presented with a memorandum of counseling. The two comparators, which again, the comparator evidence is the only basis on which the lower justice, Donald Douglas, is that there was no valid comparator evidence presented. And when you look at the discipline that those individuals received, one, Officer McQuiston, received two letters of reprimand within a month of each other. A letter of reprimand, it's not disputed that on the city's policy of progressive discipline is at a higher level than a memorandum of counseling. So let's assume that we agree the city went back and papered the instances where they had had conversations with your client, oral conversations about late reports, and so they papered the file after the fact. How does that, papering the file after the fact to reflect the incidents that had happened earlier, how does that suggest that race was the reason that Mr. Robert was fired? Well, I think that goes to, again, our contention that the court should have also considered the convincing mosaic factors. And then so you're looking at the city's complete disregard of its own policy when, you know, looking at the progressive discipline, there's no dispute that Mr. Robert didn't receive any discipline other than a memorandum of counseling, and that there's also to the record that there were no intervening instances between May 12, which is when the actual memorandum of counseling is dated, and May 31st when it was presented to Mr. Robert, there's nothing intervening there. But I guess that's the, I guess you're sort of hitting on the nub of my question, which is, okay, the city doesn't follow its policies, okay, the city is documenting after the fact oral conversations had with Robert, how does that indicate that the city terminated him because of his race? Because you then have to look at what happened that day. The officer coddling, it is our contention, had the racial animus, and we believe that that racial, there's evidence in the record of that discriminatory animus in the form of text messages. And Officer Coddling, due to all of these, this total disregard of policy, he was able to effectuate that racial animus that day. But what you, so you're relying on Coddling making racist comments to other officers, but what do those comments have to do with Robert? Well, I think that the court should look, that this court's precedent in the Jenkins versus Nell matter when you're considering the convincing mosaic, that case also involved a situation where there was a supervisor who had made racial comments not directed at the specific plaintiff. And so the court still held that that was evidence that should have been considered in the convincing mosaic framework when determining whether or not that plaintiff had presented a convincing mosaic of circumstantial evidence of racial bias. And so the issue is that this will, more oftentimes than not, discriminatory animus will be proven using circumstantial evidence. And under this court's precedent, these circumstantial evidence can include race-based comments to other individuals. And I see that my time's up. So unless there are any other questions, thank you. Thank you. Good morning. May it please the court, Edward Geddes on behalf of the City of Homestead, Chief Alexander and Deputy Chief Muccio with me for those same clients as my partner, Michael Cantor, and at council table is Suzanne Singer, who's counsel for Officer Codling. Let's go ahead and dive into the comparator issue, which seems really at the heart of this. And to clarify what this court en banc said in Lewis was, and my friend on the other side accurately stated, that they have to be similarly situated in all material respects, and then the court went on to say, such that they cannot reasonably be distinguished. And one thing my friend has kind of overlooked and hasn't discussed is that this was a probationary period. The very purpose of a probationary period for any new officer is to see whether or not she or he, in this case, he, has learned enough, is going to be a full-time permanent officer. And if that officer demonstrates over the span of that probationary period, over and over again, the inability to take direction, the inability to take additional training, the inability to take counseling, and keeps repeating the mistake over and over again, that is a critical component. And in that respect, that is the biggest difference between the two comparators of Mr. McQuinton and Rafalgo, where both of them, yes, they had incidents during their probationary period that they were counseled on, that they were, that were addressed, and they didn't repeat them. They did not, those incidents did not recur. And what the record here very clearly reflects, and there's at least 14 incidents of different people bringing to Mr. Roberts' attention the fact that he wasn't doing his paperwork, whether they were citations that had to be voided because he didn't follow up, whether there were arrest affidavits that were done in trafficking of children cases, it just kept occurring. Right up to the very end, there were issues of clerks, the assistant state attorney, calling and saying, where's my, where's the paperwork? We need the paperwork. Days would go by, repeated phone calls. It just did not seem to sit. It just didn't fit. He just wasn't processing, and even now, even now there's this reflection of, my friend described it as one minor, one minor memorandum. That was, that was the entirety of his problems. One minor memorandum when in fact the record is replete with instances. And this came about in the natural course of things as the probationary period came to an end, Captain Stephen Meyer and Lieutenant Nelson Guio, who were Officer Codling's superiors, went to him and said, okay, what's going on with Mr. Robert and his probationary period? And it was in that context that Officer Codling says, I don't think he's going to make it. I mean, there are issues, there are these problems, but that didn't even end there. Then Captain Meyer turns around and meets on four separate occasions with Deputy Chief Muccio to talk about Mr. Robert and his performance during the probationary period. And it is only after those discussions that the consensus is developed that, well, it doesn't look like he's going to make it. Chief Alexander is brought in, they all discuss it, they concur, they go, no, he's not going to make it through the probationary period. Where will I find what Meyer and the Deputy Chief talked about? Excuse me, Your Honor, I'm sorry. Where will I find what Captain Meyer and the Deputy Chief talked about, that their problems were? I know they say performance problems, but where do they detail what they viewed? The nature of what they said in that meeting? Well, they just say performance problems. Right. And that's the depth of the detail. There's no more indication in the record of what Meyer and Muccio are talking about. No, no, no. I am not aware of anywhere in the record other than it concerned generically, you know, Mr. Robert's performance during the probationary period. But, you know, did they identify specific instances in that conversation? I can't, I don't think the record reflects that, Your Honor. So, it's a situation, and it's interesting that, it's as good a place as any to segue into the question of this convincing mosaic and whether or not there is one, because, and my friend referenced the Jenkins case, but the significant difference in Jenkins and the reason the court there was willing to consider the possibility of a convincing disputed sole decision maker had made the racist comment that was at issue. In fact, just a few days ago, this court in, I believe it's pronounced Poeire, this was very recent, May 1st, distinguished Jenkins precisely on those grounds because the person who made the decision was the one that made the racist comment. And that's not our situation here. To the extent that my friend tries to ascribe Officer Codling's incident with the text messages and the emails, whatever, within the SWAT unit as somehow being carried over and placed on Captain Meyer, Lieutenant Guillaume, Deputy Chief Muccio, Chief Alexander, that all of them somehow are tainted by that. I don't think it finds any basis in fact or law. Moreover, it certainly doesn't. That's why I'm trying to see what independent investigation they did. You have the, lack of a better word, cat's paw theory that Codling is making the recommendation to them, he's pushing this, and so we need to see what Meyer and Muccio looked into and whether they did anything other than just take his recommendation. That's why I was asking you about the four times they met. Where can I find on the record what they talked about or why they did what they did? The district court said you couldn't use the cat's paw because they did an independent evaluation. So where do I find that in the record, that there was some independent review, evaluation, look at something, look at that system, halogen system, look at something besides just Codling's recommendation? I mean, you could have had, the Chief, Deputy Chief, could have sent an affidavit that he got deposed. Did he say anything in his deposition? That's where I was headed with my response, because I can't point to anything in the record that tells you exactly what was discussed. But I can also say that there's nothing in the record to indicate, even to suggest, that in those four meetings, four, not one, four meetings, it was just a cursory rubber stamp of a recommendation from one of his FTOs, who's Officer Codling. And there's just, there isn't anything plausible to suggest that the Deputy Chief and Captain Meyer would meet on four separate occasions to discuss his performance, which is uncontested, if all it was is, well, we're going to cat's paw this and we're just going to rubber stamp Officer Codling's recommendation to other superiors. It's not a logical inference to draw from the undisputed facts that are here. So while I unfortunately cannot point to record evidence that tells you exactly what was said, I can also tell you there isn't anything in there that would give one pause. There's certainly no racial animus. Nothing has been suggested that either Deputy Chief Muccio or Captain Meyer or the Chief Alexander had any racial animus towards Mr. Robert. Is there anything in the halogen system that would help us with the answer to Judge Hull's question? Is there anything documented in the halogen system about complaints from others that would have been presented? Well, in terms of the context of the halogen, because as far as I know, this was also undisputed, multiple individuals indicated the reason. The folks who counseled him, who provided additional training during the course of the probationary period, didn't always use the halogen system because it wasn't a reliable system, but they documented, they otherwise documented their interactions with Mr. Meyer. And then what happened at the end was that all of that information was then compiled and put into the halogen system. But we don't know whether Meyer or Muccio ever reviewed that. I don't believe there's anything in the record to tell you exactly that what Captain Meyer and Deputy Chief Muccio discussed during those four separate meetings was put directly in halogen. But then, given how infrequently officers, and this is all the other individuals as well, FTOs and others, sort of relied on their own paperwork rather than using the halogen system because of concerns about its reliability. But I circle back to the same point, and this sort of touches briefly, I think, Judge Branch on a question that you asked, which is, where's the connection to racial motivation, right? At the end of the day, that link has to exist. It can't just sort of be attenuated way off in some isolated one person sent inappropriate or racist text. Here are all the individuals who were, let's set Officer Codling aside just for the moment. Anybody else, there isn't the slightest indicia that any of them, in their assessment, were motivated by racial animus. None. But that's always the case. Codling's got the racial animus, and the law is that if he recommends to his superiors and they really don't do any investigation, just go with his recommendation that you can impute it. That's what I'm trying to see, whether they did anything. I mean, the law is pretty clear about that. So what does the record tell me that they did to check out what should happen with Mr. Robert? Besides just rubber stamp, you know, all we know is Codling did recommend it to him. We know that. And we know they met four times. And so, I mean, you're drawing an inference. Well, they must have discussed something else if they're just going to, it's not a rubber stamp because there would be no need to meet four times if you're just going to say, okay, Codling says it, let's do it. Well, there's also more than that, Your Honor. Well, what is it? That's what I've been asking. Well, I understand. However many times we come back to the question, I'm not going to be able to tell you what happened in those meetings, all right? I have to concede that to the court. But the context in which this process arose where it wasn't, as far as the record reflects, this wasn't a situation where Officer Codling comes charging forward and says, you all need to fire this guy. This is, this is not, he's not cutting it and he, and he's the driving impetus to this. But what the record reflects instead is that Captain Meyer and Lieutenant Keogh were the ones who requested the meeting with Codling for the purpose of saying, okay, we need to make, where are we on the probationary period with Mr. Robert? What is it? What's going on? How is he performing? And that's when Officer Codling says, I have a problem. I don't think he's going to make it. I have, he had, Officer Codling has his memorandum of counseling with details to incidences. But all of that doesn't change that the rest of it, all the other criticisms that were leveled against him when it came to issues relating to paperwork and his job duties that he kept repeating over and over, they exist. Given that the district court did not address the convincing mosaic theory, why shouldn't we just remand this case for the district court to consider that? Because it doesn't hear that remotely comes close to a mosaic. There aren't even tiles. The tiles that there are, and there's a tile, well, there's two tiles. There's the tile of Officer Codling's behavior directed at the SWAT team and those comments. And then there is the other tile, which is the, what he describes or what the other side describes as this papering of the file. Well, there's also the fact that he was terminated after receiving a single counseling memorandum, which seems to be in violation of the department's progressive discipline policy. Maybe that's a tile. Well, that's the other side's characterization. He wasn't terminated because of the counseling of memorandum. He was terminated. Well, he was terminated without the progressive discipline that's laid out in the procedures. Isn't that correct? There is no, when you're in your probationary period and you're, may I conclude my answer Yes. I noticed I ran out of time. In the probationary period, the idea is that if you're not improving, if you're not getting it right, right? You haven't satisfied your probationary period. This isn't a situation where you successfully completed your probationary period. You're a fully functioning officer, right? And now you have this situation, well, okay, here's your first warning, you did this wrong. Here, in the probationary context, Mr. Robert just kept doing the same things over and over and over again wrong. What in the record supports your argument that the probationary period is different or that the normal progressive discipline doesn't apply? I don't think the parties ever, I can't point to something in the record because I don't think the parties ever fixated on that. It was just assumed that even when you look at the comparators, the comparators that were put forward to also their behavior was taken in the context of the probationary period. So I don't think anybody was... I thought in the memorandum, I'm understanding, I'm looking at it, they refer to violation of policies. Yeah, policy violations 82.02 and they give him a memorandum of counseling, which is in disciplinary procedures, and then they use those procedures in, say, domestic and dating violence, and then CBOCA personnel rules and regulation, Article 7, Discipline and Removal Employees, Section 1A has been incompetent, negligent, and inefficient. So it seems like they're applying disciplinary procedures when they terminate him. So I don't know how you say, well, they don't apply during the probationary period. If that's what I conveyed to the court, I apologize. Okay. That was my point. But the very provisions that Your Honor is referring to are provisions relating to efficient performance, how well is he performing, and that failure to comply, that failure to meet that standard is substantially documented in this record in terms of all the time he has counseled and retrained on these issues. You've answered my question. Thank you. If the court has additional questions, we would respectfully request that the court affirm. Thank you, Your Honor. Thank you, Mr. Meyer. And to answer Judge Hall's question, the Deputy Chief of the Community Jail was deposed, and her testimony was that she didn't remember the details of what occurred in the conversations with Mr. Meyer. She also indicated that she did not reach out to him. It wasn't part of any formal investigation. Officer Meyer came to her. One of the items that my colleague mentioned was that there are Okay. But let me go back. Coddling didn't come to her. No. Did she say coddling didn't come to her, or rather they went to coddling? That is important to me. So what does the record tell me? The record will tell you that Officer Meyer went to the Deputy Chief of Community Jail to discuss the incidences. And did Meyer go to coddling then? Yes. Okay. So we don't have coddling initiating. I'm not saying this is outcome determinative. I'm just trying to put the pieces together. We don't have coddling going to them saying, y'all need to do something. We have them in the normal course of things. They got a probationary employee. They got to figure out what they're going to do, and they went and looked at it. Is that what we have? Well, I believe that the origin of all of the accusations against Mr. Robert is Officer Coddling. And I believe that he, the record will show that he then, as part of what we claim is the discriminatory animus to terminate Mr. Robert on the basis of his race, then initiated that process. And so that is, I don't know that it is as formal as Your Honor is describing. I believe that there were, that Officer Coddling ran it on the chain, so to speak. Yeah, but did Meyer and Muccio, you said Meyer went to Muccio. Coddling didn't go to Muccio. Officer Meyer is the in-between, between Officer Coddling and Muccio. Muccio's above, and so Meyer goes to Muccio, and they meet. Okay. All right. Is that what we have here? That's correct, Your Honor. Okay. And so, we don't have Coddling go to Muccio, right? No, Your Honor. Okay. But Deputy Chief Muccio does see that Officer Coddling is the one who prepared the memorandum of counseling, because she initialed it prior to it being given to Officer Robert. Okay. That will reflect that. And I would like to address the idea that there's no convincing mosaic here, that there's not even a tile. The record will show that the convincing mosaic includes Officer Coddling's racist text messages, his use of the N-word in the presence of a black officer. The city completely disregarded its progressive discipline policy in terminating Mr. Robert after a single memorandum of counseling. Mr. Robert did not receive any performance evaluations, despite the comparators having received performance evaluations, which is contrary to city policy, even for probationary officers. The city characterizes its informal discussions with Mr. Robert as being supervisory coaching, where its written policy states that in order to qualify as supervisory coaching, these incidences need to be documented in the halogen system. None were until Officer Coddling then initiated his campaign to pay for the file. City representatives prepared the letter of resignation that Mr. Robert ultimately signed in advance. They misspelled his name. There's a total lack of any independent investigation of any of the allegations that were made against Mr. Robert on the part of Deputy Chief Muccio or Chief Alexander. It is unequivocal that neither discussed Mr. Robert's termination with the city manager, who is supposedly the one who needs to... But you're not really contesting the fact that your client was late on paperwork? I am disputing... I mean, the records clerk, these independent clerk's offices, call them, you've got to do this. You're not contesting that happened? I am not contesting that the e-mails were sent to Officer Robert. I believe that Officer Robert does contest the characterization of those e-mails as detailed in our opposing statement of material facts below. I would also urge the court to... Well, I don't know that the supervisors have to be all into that. They just have to know there's late paperwork on a repeated basis. And the evidence does seem to show, it may not be in every instance that they claim, repeated examples of late paperwork or incomplete paperwork. You can't... Or problems with paperwork, let's say that. And maybe that's what happens in your first year as an officer, I don't know. Your Honor, my response to that would be that, again, we have to look at the conduct for which Mr. Robert was terminated, because the Supreme Court's decision in McKinnon v. Nashville in discussing after acquired evidence states that the employer could not have been motivated by knowledge it did not have at the time the termination decision was made. That's why these factors cannot go to the determination of the prima facie... So even if it was in the halogen system at the time of the termination, you're saying nobody looked at it or there's no evidence anybody looked at it or knew about it or what have you? Is that your position? My position is that the halogen system, to the extent it contains any records, was retroactively papered by Officer Codling between May 5th and May 12th. But I didn't think you really contested those instances occurred. They may be papered up when they did paper it up in May 11 to 17, but you're not really saying all of those things never happened. I think that Your Honor is getting to a factual dispute that the jury should have decided because the characterization of those instances as anything other than in the ordinary course of the probationary officer's first year is anything approaching discipline, something that should be the basis for termination, let alone a jump from the memorandum of counseling to termination in the matter of two weeks. And none of those instances occurred between when the memorandum was drafted and May 31st. Thank you.  Thank you, Your Honor.